**In the Matter of Frederick N. TAFF, Debtor.**

**Elizabeth C. WARREN, Plaintiff,**

**v.**

**Frederick N. TAFF, Defendant.**

**Bankruptcy No. 2–80–00977.**
**Adv. Proceeding No. 2–80–0478.**

United States Bankruptcy Court, D. Connecticut.

March 13, 1981.

Doris B. Shiller, Marsh, Day & Calhoun, Bridgeport, Conn., for plaintiff.

Eric M. Gross and Bernard Green, Bridgeport, Conn., for defendant.

## MEMORANDUM AND ORDER

ROBERT L. KRECHEVSKY, Bankruptcy Judge.

### I.

Frederick N. Taff, the debtor, filed a petition for relief under Chapter 7 of the Bankruptcy Code on September 25, 1980. Except for an unpaid fee to his attorney, the only creditor listed in his schedules is his former wife, Elizabeth C. Warren (plaintiff). Her claim, listed in the amount of $21,900.00, is described as a "contract debt —disputed". Taff's schedules of assets and exemptions disclose various items of personal property with a total stated value of $8,862.26, and social security benefits and a "Uniroyal Qualified Salaried Pension Plan" of no ascribed values, all of which are claimed by him as exempt property. Although Mrs. Warren has not yet filed a proof of claim, she issued a complaint against Taff on November 12, 1980 alleging, *inter alia*, (1) that her claim listed by Taff is nondischargeable because it represents alimony, support or maintenance pursuant to 11 U.S.C. § 523(a)(5);[1] (2) that Taff should be denied a discharge because he has failed to explain satisfactorily a deficiency of assets to meet his liabilities under 11 U.S.C. § 727(a)(5);[2] and, (3) that the payments Taff receives under his pension are not exempt under 11 U.S.C.

[1] *Section 523. Exceptions to discharge.*

(a) A discharge . . . does not discharge an individual debtor from any debt—

(5) to a . . . former spouse . . . for alimony to, maintenance for, or support . . . in connection with a separation agreement, divorce decree, or property settlement agreement, but not to the extent that—

.     .     .     .     .

(B) such debt includes a liability designated as alimony, maintenance or support, un-less such liability is actually in the nature of alimony, maintenance or support . . . .

[2] *Section 727. Discharge.*

(a) the court shall grant the debtor a discharge, unless—

.     .     .     .     .

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities; . . .

§ 522(d)(10)(E)[3] as they are in excess of an amount needed to support him and any dependent.[4] Taff filed an answer generally denying all of these assertions.

## II.

At the trial, the plaintiff introduced into evidence an executed separation agreement (agreement) between her and Taff dated May 9, 1969. The agreement recites that the parties were married on June 12, 1937, have five children, two of whom are minors, and that since the parties are now living separate and apart from each other, they wish to adjust property rights and provide for support and maintenance of the plaintiff and the minor children. The agreement provides for the support of the minor children by Taff, including payment for a four-year college education. Taff agrees, under Section IV, entitled "Support Payments", to pay varying amounts to the plaintiff during her life, such payment to cease upon her remarriage.[5] These amounts are to be computed generally according to formulae contained in the agreement, but for the first two years, the plaintiff was to receive not less than $18,000.00 per year.[6] In Section VI of the agreement, the plaintiff "acknowledges that the provisions herein made for her support and maintenance ... are fair, adequate and reasonable and satisfactory to her". Section III, entitled "Division of Property", provides for two transfers of property by Taff to the plaintiff. Both transfers were to be without income tax liability on the part of the plaintiff. The first transfer called for by Section III was to comprise all of Taff's interest in a jointly-owned home in Woodbury, Connecticut and its furnishings. The second transfer called for is the basis of the dispute between the parties and is set forth in the agreement as follows:

Husband agrees to transfer to Wife between the dates of September 1, 1970 and January 31, 1971, 400 shares of Uniroyal, Inc. as it exists on December 1, 1968 together with stock splits or stock dividends if such stock is split or stock dividends payable in Uniroyal stock are received thereon before such transfer. Such obligation on the Husband is not conditioned on the death or remarriage of the Wife, but payable to the Wife or her estate in all events. Until transfer, the Husband shall be entitled to all dividend paid on such shares and to vote such shares. Husband will also be entitled to sell or transfer such shares he now owns, but will be required to replace such shares at the time the foregoing transfer is to be made.

Taff evidently did not make the stock transfer by January 31, 1971, and the plaintiff's post-trial brief states that the plaintiff instituted "an action for breach of contract in 1976".[7] This action was pending in the Connecticut superior court and scheduled for trial on September 30, 1980 when Taff filed his petition for relief on September 25, 1980, thereby preventing the trial under the automatic stay provisions of the Bankruptcy Code (11 U.S.C. § 362).[8] The plaintiff has chosen to rely solely on the

---

**3.** *Section 522. Exemptions.*

(d) The following property may be exempted ...

(10) The debtor's right to receive—
(E) a payment under a stock bonus, pension, profit sharing, annuity, or similar plan or contract on account of illness, disability, death, age, or length of service to the extent reasonably necessary for the support of the debtor and any dependent of the debtor ....

**4.** The State of Connecticut has not opted out of the federal exemptions and Taff selected the federal exemptions in his petition. *See* 11 U.S.C. § 522(b).

**5.** These support provisions take up 14 pages of the 30-page agreement.

**6.** Although it was not mentioned at the trial, the court assumes from the present surname of the plaintiff that she subsequently remarried and that these provisions are now inoperative.

**7.** Nowhere in the record is the date of the divorce stated. The court assumes it was shortly after the date of the separation agreement of May 9, 1969 since Taff himself remarried on May 21, 1969.

**8.** The plaintiff's complaint includes in its prayer for relief a request that the state court proceeding be allowed to go forward.

language of the agreement for her assertion that the stock transfer represents support, and has introduced no evidence concerning the background of the execution of the agreement, the intention of the parties, or the existence or nonexistence of marital property other than that referred to in Section III. Taff, who was called as a witness by the plaintiff, was not questioned concerning the agreement, and the plaintiff did not testify.[9] Despite the citation of cases by the plaintiff which hold that the court is not bound by the labels used in separation agreements in distinguishing between support and property provisions, e. g., *In re Smith*, 436 F.Supp. 469 (N.D.Ga.1977), the court finds, on record before it, that Section III of the agreement deals only with a property settlement, and not with support obligations. In *Smith, supra*, there is an express holding that the court should hear and consider all of the circumstances surrounding the execution of a separation agreement "and all other relevant incidents bearing on the intent of the parties or their apparent object in contracting". *Id.* at 475. It was only after hearing such extensive testimony that the *Smith* Court felt justified in ignoring the label used by the parties. The plaintiff also refers to *In re Mohrlok*, 2 B.R. 224 (Bkrtcy., W.D.Mo.1980), for the proposition that a court can decide whether an agreement relates to support or to property division based on the document itself, and no other evidence is necessary. However, in *Mohrlok*, the bankruptcy court had before it a judgment of the divorce court which included findings of fact and conclusions of law on the issue of support which was "very explicit, lengthy and unambiguous". No such findings and conclusions are before me, and *Mohrlok* is not apposite. In addition, the stock transfer in issue is not conditioned on the death or remarriage of the plaintiff, but is payable to her or her estate in any event. Obligations which do not terminate on the death or remarriage of the obligee spouse and do not expressly or inferably relate to living

expenses are more indicative of property settlements than support payments. *In re Snyder*, 7 B.R. 147, 150 (D.C., W.D.Va., 1980) and cases therein cited. *Cf. In re Smith, supra*, at 475. The burden of proof in proceedings to determine a debt nondischargeable is on the holder of the debt, and the plaintiff has not met that burden.

### III.

On the issue of whether Taff should be denied a discharge due to his failure to explain any deficiency of assets to meet his liabilities, the plaintiff points to the Statement of Affairs filed with Taff's petition which discloses that in 1978, the year he retired at age 65, he had an income of $70,983.61. Since then his annual income has averaged $36,000.00 from social security and pension payments. The plaintiff did not elicit from Taff any significant testimony as to his use of this income. Taff stated only that he paid the household expenses at his wife's home. Bankruptcy Rule 407 specifically provides: "At the trial on a complaint objecting to a discharge, the plaintiff has the burden of proving the facts essential to his objection". There was nothing in the statements made by Taff on the witness stand in response to the few questions directed to him which affords the court a basis for denying Taff his discharge. The plaintiff has failed to bear her burden of proof. 1A *Collier on Bankruptcy* (14th ed.) ¶¶ 14.59–14.60.

### IV.

The objection by the plaintiff to Taff's claim that pension payments are totally exempt brings the parties and the court into uncharted waters. There appear to be no reported cases which the parties or the court have located dealing with the pension exemption of § 522(d)(10)(E). Furthermore, when compared to the results obtained by this court's examination of the legislative history of the enactment of the Bankruptcy Code of 1978 in previous instances, reference therein to exemption of pension

---

9. "Where a debt is (sic) characterized as alimony, maintenance or support is in dispute, the court should hold an evidentiary hearing in order to determine whether the debt is 'actually in the nature of alimony, maintenance or support' within the meaning of § 527(a)(5)." 3 *Collier on Bankruptcy* (15th ed.) § 523.15[5] at p. 523–112.

payments is relatively sparse. The specific issue in the proceeding at bar is the standard to be applied in construing the portion of § 522(d)(10)(E) which exempts pension payments only "to the extent reasonably necessary for the support of the debtor and any dependent of the debtor".[10]

Turning first to the evidence, once again, as was true with respect to prior issues, the parties offered limited testimony at trial. Taff testified that he retired from Uniroyal, Inc. as vice-president in 1978; that during 1980, his social security benefits totaled $6,735.00, that he had $1,185.00 interest income, and that he received $29,226.84 from his pension payments.[11] Taff stated that from his income he pays all the household expenses at the home occupied by him and his wife. Taff's present wife, called by the plaintiff, testified that she resigned from Uniroyal, Inc. in 1969 and is now retired, has an annual income of $20,000.00 derived from a portfolio of stocks, bonds and money market investments with a present value of $232,500.00. She stated that she and Taff live in a house constructed in 1970 on a three-acre parcel in Roxbury, Connecticut and paid for with her funds. The cost of the land and house construction was $130,000.00. The property is encumbered by a $53,000.00 mortgage. She acknowledged no other liabilities. Her remaining assets consist primarily of two automobiles, one of which (a Mercedes) is valued at $20,000.00. Evidence submitted with respect to living expenses at the Roxbury house shows a monthly mortgage payment of $469.83 and an annual electricity bill of $2,347.00.

Congressional committee reports and debates do not refer to the background or purpose of the phrase limiting pension payment exemptions "to the extent reasonably necessary for the support of the debtor and any dependent of the debtor". In attempting to discover the origin of this language, one is led first to the Report of the Commission on Bankruptcy Laws of United States, H.R.Doc.No. 93–137, 93rd Cong., 1st Sess. (1973). The Commission on Bankruptcy Laws (Commission) was established in 1970 by the Congress to study, analyze, evaluate and recommend changes in the bankruptcy laws of the United States. In 1973, it filed its report together with a proposed completely revised bankruptcy statute. Although previous bankruptcy laws had deferred to the states for the enactment of the exemptions to be allowed to a bankrupt in the state of his domicile, the Commission proposed a "federal" list of exemptions to be of nationwide application in place of the state exemptions. In § 4–503(c)(6) of its proposed bankruptcy act, the Commission allowed as exempt

> before or after retirement, such rights as the debtor may have under a . . . pension . . . which is established for the primary purpose of providing benefits upon retirement by reason of age, health, or length of service . . . to the extent . . . the debtor's interest therein is reasonably necessary for the support of the debtor and his dependents.

Resolution of the problems of the standard of support to be sustained, and the effect of other resources of the debtor, was not provided for in the proposed bankruptcy act. While the Commission proposal was before Congress, the National Conference of Commissioners on Uniform State Laws promulgated in August, 1976 a Uniform Exemptions Act (UEA) which sought to conform state exemption laws generally to the Commission's proposals. Section 6 of the UEA followed the Commission's proposed list of exemptions except that UEA § 6(b) defined the phrase "property to the extent reasonably necessary for the support of [the debtor] and his dependents" to mean

> property required to meet the present and anticipated needs of the individual and his dependents as determined by the court after consideration of the individual's responsibilities and all the present

---

**10.** 11 U.S.C. § 522(a) defines a dependent as including a "spouse, whether or not actually dependent".

**11.** It appears from an exhibit introduced by the plaintiff that Taff would have been entitled to annual pension benefits of $35,555.00, but he chose the lower benefits to allow those benefits to continue, in part, for the benefit of his present wife after his death.

and anticipated property and income of the individual, including that which is exempt.

The Bankruptcy Code of 1978 wound its way through Congress until the day of enactment in two separate versions—one in the House and one in the Senate. When in 1977, the House Judiciary Committee reported out its version of a new bankruptcy law, it included an option for a debtor to choose either state law exemptions or the federal exemptions. In its list of federal exemptions, the House Bill exempted pension plans *without* limitation. The *House Report* No. 95–595, 95th Cong. 1st Sess. (1977), 361 (*House Report*), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6317 noted as to the federal exemptions: "They are derived in large part from the Uniform Exemption Act, promulgated by the Commissioners of Uniform State Laws in August, 1976." The Senate Judiciary Committee's version of a new bankruptcy law retained the former law's policy of looking only to state law for exemptions and omitted alternative federal exemptions. In the compromise measure which was enacted by Congress in 1978 to become the present law, the option provision in the House version for the debtor to choose between exemption systems was retained, and the "reasonably necessary" language was inserted with respect to pension plans.[12] This language raises several questions of construction. For how long must the needs of the debtor be anticipated? Does this period include any additional period after his death during which his dependents might need to rely upon these payments? Is the debtor to be allowed only enough for his basic needs, or is he entitled to maintain his customary style of living? Are we to judge his needs

by his status in life, and are we to consider his other sources of income, existing and potential? See Plumb, *supra*, 94–95. I assume that Congress omitted from the Bankruptcy Code the statutory definition of the reasonably necessary limitation contained in the UEA because it expected the courts to evolve standards on a case-by-case basis. The historical purpose of exemptions, whether in bankruptcy circumstances or otherwise, is to protect a debtor from creditors by permitting him to retain the basic necessities of life so that after his creditors have levied on or receive all nonexempt property, the debtor will not be left destitute and a public charge. *House Report*, p. 126. In 1977, Connecticut modernized its exemption statutes and included as exempt from creditors, payments received under a pension plan "to the extent that wages are exempt from execution under section 52–361". Conn.Gen.Stat. § 52–352c(d). Wages garnisheed under Conn.Gen.Stat. § 52–361 cannot exceed 25% of disposable income. *See Sienkiewicz v. Sienkiewicz*, 178 Conn. 675, 680, 425 A.2d 116 (1979). This restriction on garnishment of pension payments is mandated by the Consumer Credit Protection Act, 15 U.S.C. § 1671, *et seq.* (CCPA). Thus, if Taff had selected the state exemptions, the maximum that could be withheld from him would be 25% of the pension payments. The United States Supreme Court in *Kokoszka v. Belford*, 417 U.S. 642, 94 S.Ct. 2431, 41 L.Ed.2d 374 (1974) held that the CCPA did not apply to bankruptcy estates, at least under the Bankruptcy Act of 1898. *See Matter of Brisette*, 561 F.2d 779 (9th Cir. 1977). "While the *Kokoszka* court did not directly hold that the CCPA is not a federal bankruptcy statute, such a conclusion is compelled by its reasoning and by the legislative history of the CCPA there

12. Exempting pensions without limit discriminates in favor of those persons who either provided for themselves, or were provided for by employers, through such pension plans. Such complete exemption denies like protection to those persons who attempt to provide for themselves and their families in later years in some other manner. Plumb, *The Recommendations of the Commission on the Bankruptcy Laws—Exempt and Immune Property*, 61 Va.L.Rev. 1, 95 (1975); Vukowich, *Debtors' Exemption Rights*, 62 Geo.L.J. 779, 824 (1974).

It is obvious that a debtor whose provision for old age is not in the form of a pension plan, but is in cash or securities, does not receive any like protection from creditors. Plumb, *supra* at 59, points out that "it is with private plans particularly in mind that the commission has proposed the reasonable support limitation, because of the well-known fact that a corporate officer or a member of a professional corporation may be entitled to vested pension benefits aggregating hundreds of thousands of dollars."

discussed". *Id.* at 784–785. I assume a like result under the Code.

The foregoing review of the legislative background, including the *House Report* reference to the UEA, the rationale underlying exemption laws, comments in the cited law review articles, and the holding in *Kokoszka, supra* all lead me to conclude that the reasonably necessary standard requires that the court take into account other income and exempt property of the debtor, present and anticipated, that the limitation provisions of the CCPA are inapplicable, and that the appropriate amount to be set aside for the debtor ought to be sufficient to sustain basic needs, not related to his former status in society or the lifestyle to which he is accustomed but taking into account the special needs that a retired and elderly debtor may claim.

It is well settled that when a debtor claims an exemption and an objection thereto is raised, the burden of proof of entitlement to the exemption is on the debtor. 1A *Collier*, (14th ed.), *supra*, p. 919. The record in this proceeding discloses that Taff has only one significant creditor, whose claim is disputed and yet to be determined.[13] No evidence was introduced as to Taff's special needs and responsibilities. Taff has available a total annual income of $37,146.00 and exempt assets exceeding $8,000.00. I conclude upon this record that 50% of the payments received from his Uniroyal pension ($14,613.42 per annum) are not exempt, are part of this estate, and shall be collected by the trustee from the date of the filing of the debtor's petition, and held by him pending determination of the claim of the plaintiff, and further order of the court.[14]

The complaint of the plaintiff will be treated as a request for relief from stay, and the court hereby modifies the automatic stay to allow the pending case in the state court to proceed. The trustee will take the appropriate steps to be made a party to the state court proceeding. It is

SO ORDERED.

This memorandum shall constitute Findings of Fact and Conclusions of Law pursuant to Rule 752 of the Rules of Bankruptcy Procedure.

---

13. Taff, as noted, *supra* listed the plaintiff's disputed claim in the amount of $21,900.00. The plaintiff claims, in her brief, that the value of the stock at the time it was supposed to have been transferred was $15,000.00.

14. Although the Congressional reports are silent as to what steps a trustee should take once the court finds that there is an excess of the pension payments to which the estate is entitled, the Commission Report, part II, at 151 suggests the trustee may "sell the right to the excess income, hold open the case so as to collect the income, or reach the principal . . . subject, of course, to the rights of any third persons in the principal".