# IN THE SUPREME COURT OF IOWA

No. 19–1994

Submitted December 15, 2020—Filed March 12, 2021

**COMMERCE BANK,**

Appellee,

vs.

**ROBERT R. McGOWEN,**

Appellant.

Appeal from the Iowa District Court for Polk County, Coleman McAllister, Judge.

Appeal from the district court's order denying a debtor's claim that certain funds paid pursuant to a deferred compensation plan were exempt from garnishment. **REVERSED AND REMANDED.**

McDonald, J., delivered the opinion of the court, in which all participating justices joined. Appel, J., took no part in the consideration or decision of the case.

Steven P. Wandro (argued), Kara M. Simons, and Brian J. Lalor of Wandro & Associates, P.C., Des Moines, for appellant.

Michael S. Mather (argued) and Kelly S. Hadac of HKM, P.A., St. Paul, Minnesota, and Thomas J. Cahill of Cahill Law Offices, Nevada, for appellee.

**McDONALD, Justice.**

Iowa Code section 627.6(8)(*e*) (2019) provides a debtor may exempt from execution "[a] payment or a portion of a payment under a pension, annuity, or similar plan or contract on account of illness, disability, death, age, or length of service." The issue in this garnishment proceeding is whether payments made to a debtor under a deferred compensation plan fall within the scope of the statutory exemption.

### I.

Commerce Bank obtained a judgment against Robert McGowen in Minnesota in the amount of $1,500,000 plus interest. The bank then domesticated the judgment in Polk County, Iowa. Several years after Commerce Bank domesticated the judgment in Iowa, it caused to be issued a writ of general execution directing the sheriff to levy on McGowen's employer, McGowen, Hurst, Clark & Smith, P.C. (hereinafter "the company"). Pursuant to Iowa Code section 642.15, McGowen moved to exempt all payments made to him under the company's deferred compensation plan, claiming the deferred compensation payments were exempt under section 627.6(8)(*e*).

The plan at issue is a deferred compensation plan intended to be compliant with Internal Revenue Code section 409A. According to the plan documents, "[t]he Plan is intended to provide incentive to shareholders of the Company to promote the growth, profitability and long-term success of the Company." Participation in the plan is limited to the company's shareholder employees. The plan provides for three types of deferred compensation, only two of which are at issue in this appeal. According to the plan documents, Type 1 compensation is available to all company shareholders and is "intended to approximate the realizable value of the Company's receivables and unbilled work in process." Type 2A

compensation is limited to seven identified shareholders of the company, including McGowen. The plan provides Type 2A compensation intended to approximate the shareholder's "pro-rata portion of the intangible value of the Company's professional practice." It is "calculated at 80% of the average of the Company's prior three fiscal years' collected fees." Payment of deferred compensation is triggered upon the occurrence of one of the following events: separation from service, attainment of age sixty-seven, disability, death, or sale of substantially all of the company's assets. Type 1 deferred compensation benefits are paid in thirty-six equal monthly payments, and Type 2A deferred compensation benefits are paid in equal monthly installments over ten years. McGowen reached age sixty-seven, and he receives both Type 1 and Type 2A deferred compensation payments.

Lacking any controlling authority on the issue, the parties and the district court relied on persuasive federal precedents to interpret and apply the statutory exemption. McGowen primarily relied on a decision from the United States Bankruptcy Court for the Southern District of Iowa, *In re Pettit*, 55 B.R. 394 (Bankr. S.D. Iowa), *aff'd*, 57 B.R. 362 (S.D. Iowa 1985). In that case, the bankruptcy court considered whether the debtor's interest in a bank's profit-sharing plan was exempt under Iowa Code section 627.6. *See id.* at 395. The bankruptcy court interpreted the statute to exempt payments that served as wage substitutes when the debtor would likely have lower income:

> It is reasonable to conclude that the state legislature, by using the terms 'similar plan or contract,' intended that plans having 'pension' or 'annuity' characteristics should be exempt. Such an intent would further the 'fresh start' purpose of exemption statutes in that 'pension-annuity' type arrangements are created to fill or supplement a wage or salary void.

*Id.* at 397–98. In that light, the court reasoned a plan or contract is "similar" to a pension or annuity if it exhibited the following: (1) a formal plan to benefit the debtor as part of an employer–employee relationship, (2) benefits that are similar to future earnings of the debtor like retirement income or deferred employment income for future support, (3) someone other than the debtor has control and access to the plan with limitations on withdrawal or distribution to further the purpose of setting it aside for retirement or deferred income, and (4) payment under the plan is based upon illness, disability, death, age, or length of service. *Id.* at 398.

Applying the four factors to the profit-sharing plan at issue, the bankruptcy court concluded the profit-sharing plan fell within the statutory exemption. *Id.* The plan documents stated the intent of the plan was "to provide retirement and other benefits for the sole and exclusive benefit of the Bank's employees." *Id.* at 395. The bank contributed to the plan on the employee's behalf, and the employee's interest was fully vested. *Id.* The plan was managed by a trustee, and disbursement was controlled by the trustee and a committee. *Id.* at 396. Participants (or their beneficiaries) received a lump sum cash payment upon the occurrence of a specific event: the participant's sixtieth birthday, retirement, disability, termination of employment, or death. *Id.*

Commerce Bank relied on a decision from the United States Bankruptcy Appellate Panel of the Eighth Circuit, *Eilbert v. Pelican.* 212 B.R. 954 (B.A.P. 8th Cir. 1997), *aff'd sub nom. In re Eilbert*, 162 F.3d 523 (8th Cir. 1998). In that case, the debtor was a seventy-seven-year-old widow. *See Eilbert v. Pelican*, 212 B.R. at 955. "[H]er husband, Raymond E. Eilbert, was involved in an automobile accident with appellee David Pelican. Raymond Eilbert was killed and Pelican

sustained severe injuries." *Id.* Pelican sued Eilbert's estate and the widow for damages arising out of the car accident. *See id.* at 955–56.

> Anticipating the entry of a large judgment against her, [the widow] sought to transform her primarily non-exempt assets into exempt property in the event she filed bankruptcy. Accordingly, . . . the debtor used the liquidated proceeds [of her husband's estate] to purchase a single premium . . . Variable Annuity Contract in the amount of $450,000.

*Id.* at 956. Pelican obtained a judgment against the estate and the widow, and the widow declared bankruptcy. *Id.* The question presented was whether the annuity was exempt from the bankruptcy estate. *See id.* at 957.

The *Eilbert* court held the annuity was not exempt. *Id.* at 960. In reaching that conclusion, the court rejected the debtor's contention that the asset was per se exempt because it was an annuity, explaining that " 'annuity' is a purely generic term which refers to the method of payment and not to the underlying nature of the asset." *Id.* at 958. The court stated the relevant question was whether the asset at issue was a "similar plan or contract" and concluded the resolution of that question was a peculiarly factual inquiry. *Id.* (quoting Iowa Code § 627.8(*e*)). Under the peculiar facts of the case, the court held the annuity was not exempt. *See id.* at 959–60. The United States Court of Appeals for the Eighth Circuit affirmed the bankruptcy panel opinion on somewhat different grounds. The Eighth Circuit reasoned the payments received by Eilbert were not akin to future earnings. *See In re Eilbert*, 162 F.3d at 527. "Instead, the annuity was purchased with non-exempt, inherited assets as a prebankruptcy planning measure by a prospective debtor who happened to have already reached retirement age." *Id.*

The district court here found the *Eilbert* case more persuasive and held McGowen's deferred compensation payments were not exempt under Iowa Code section 627.6(8)(*e*). McGowen timely filed this appeal.

II.

A.

This case presents a question of statutory interpretation, and our review of the district court's decision is for the correction of errors at law. *See In re Marriage of Eklofe*, 586 N.W.2d 357, 359 (Iowa 1998); *Iowa Dep't of Revenue & Fin. v. Peterson*, 532 N.W.2d 805, 806 (Iowa 1995); *In re Est. of Deblois*, 531 N.W.2d 128, 130 (Iowa 1995). The burden is on the debtor to show an exemption applies. *See First Nat'l Bank v. Larson*, 213 Iowa 468, 472, 239 N.W. 134, 136 (1931). Although the burden is on the debtor to show an exemption applies, "[i]t is well settled that exemption statutes must have a liberal construction." *Kelly v. Degelau*, 244 Iowa 873, 875, 58 N.W.2d 374, 376 (1953). Exemption statutes must be liberally construed to "carry[ ] out the beneficient object of the legislation." *Frudden Lumber Co. v. Clifton*, 183 N.W.2d 201, 203 (Iowa 1971) (quoting *Roberts v. Parker*, 117 Iowa 389, 390, 90 N.W. 744 (1902)).

In questions of statutory interpretation, "[w]e do not inquire what the legislature meant; we ask only what the statute means." Oliver Wendell Holmes, *The Theory of Legal Interpretation*, 12 Harv. L. Rev. 417, 419 (1899). We seek to determine the fair and ordinary meaning of the statutory language at issue. *See State v. Davis*, 922 N.W.2d 326, 330 (Iowa 2019) ("We give words their ordinary meaning absent legislative definition."); *In re Marshall*, 805 N.W.2d 145, 158 (Iowa 2011) ("We should give the language of the statute its fair meaning, but should not extend its reach beyond its express terms.").

In determining the fair and ordinary meaning of the statutory language at issue, we consider the language's relationship to other provisions of the same statute and other provisions of related statutes. *See* Iowa Code § 4.1(38) ("Words and phrases shall be construed according to the context and the approved usage of the language . . . ."); *State v. Doe*, 903 N.W.2d 347, 351 (Iowa 2017) (stating we consider the "relevant language, read in the context of the entire statute"). If the "text[ of a statute is plain and its meaning clear, we will not search for a meaning beyond the express terms of the statute or resort to rules of construction." *In re Est. of Voss*, 553 N.W.2d 878, 880 (Iowa 1996); *see also State v. Richardson*, 890 N.W.2d 609, 616 (Iowa 2017) ("If the language is unambiguous, our inquiry stops there."). If the language of the statute is ambiguous or vague, we "may resort to other tools of statutory interpretation." *Doe*, 903 N.W.2d at 351.

In determining the fair and ordinary meaning of a statutory exemption, we also consider persuasive federal authorities interpreting similar provisions of the Bankruptcy Code. Iowa has opted out of the federal exemptions allowed under the Bankruptcy Code. *See* 11 U.S.C. § 522(b)(1)–(2); Iowa Code § 627.10. However, Iowa Code section 627.6(8)(*e*) "was modeled on the nearly identical federal exemption found in 11 U.S.C. § 522(d)(10)(E)." *In re Eilbert*, 162 F.3d at 526. When an Iowa statute is borrowed from similar federal legislation, we "presume our legislature intended what Congress intended." *City of Davenport v. Pub. Emp. Rels. Bd.*, 264 N.W.2d 307, 313 (Iowa 1978) (en banc). Here, Congress described the exemption at issue as one "exempt[ing] certain benefits that are akin to future earnings of the debtor." H.R. Rep. No. 95–595, at 362 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 6318.

## B.

The statute provides a debtor may exempt from execution "[a] payment or a portion of a payment under a pension, annuity, or similar plan or contract on account of illness, disability, death, age, or length of service." Iowa Code § 627.6(8)(*e*). The plain language of the statute makes clear the debtor must establish two things to claim the exemption at issue. First, the debtor must establish the payment claimed to be exempt was made under a pension, annuity, or similar plan or contract. *See id.* Second, the debtor must establish the pension, annuity, or similar plan or contract is payable or is being paid on account of illness, disability, death, age, or length of service. *See id.*; *Rousey v. Jacoway*, 544 U.S. 320, 325–26, 125 S. Ct. 1561, 1566 (2005) (identifying these as the relevant inquiries); *In re Eilbert*, 162 F.3d at 526–27 (same).

## 1.

We first address whether McGowen has established the deferred compensation payments were made under a pension, annuity, or similar plan or contract.

There is no claim here the deferred compensation payments are pension or annuity payments. We thus focus on the question of whether the deferred compensation payments were made under a plan or contract similar to a pension or annuity. "To be 'similar,' an [asset] must be like, though not identical to, the specific plans or contracts listed in [the statute], and consequently must share characteristics common to the listed plans or contracts." *Rousey*, 544 U.S. at 329, 125 S. Ct. at 1568. The asset must "have the same 'primary purpose'" as those listed in the statute. *Id.*

"Pension" is a well-understood term. A "pension" is "[a] regular series of payments made to a person (or the person's representatives or

beneficiaries) for past services or some type of meritorious work done." *Pension, Black's Law Dictionary* (11th ed. 2019). A pension is also defined as "[a] fixed sum paid regularly to a person (or to the person's beneficiaries), esp[ecially] by an employer as a retirement benefit." *Id.* The Supreme Court defined pension under the parallel federal exemption statute as "a fixed sum . . . paid under given conditions to a person following his retirement from service (as due to age or disability) or to the surviving dependents of a person entitled to such a pension." *Rousey*, 544 U.S. at 330, 125 S. Ct. at 1568–69 (quoting *Webster's Third New International Dictionary* 1671 (1981) [hereinafter *Webster's 3d*]). A pension generally is compensation deferred until a later date, typically not payable "until a time when the beneficiary's earning capacity is limited." *Pettit*, 55 B.R. at 398.

An annuity is "[a] fixed sum of money payable periodically; specif[ically], a particular amount of money that is paid each year to someone, usu[ally] until death." *Annuity, Black's Law Dictionary* (11th ed. 2019). Annuities involve a right to receive income payments over a fixed period. *Pettit*, 55 B.R. at 398. An annuity is normally obtained through employment and withdrawn during retirement or after death by beneficiaries. *Id.* The Supreme Court defined an annuity as "an amount payable yearly or at other regular intervals . . . for a certain or uncertain period (as for years, for life, or in perpetuity)." *Rousey*, 544 U.S. at 330, 125 S. Ct. at 1569 (omission in original) (quoting *Webster's 3d* at 88). Like a pension, an annuity is compensation deferred into the future payable at some later date when the recipient typically would have lower earnings.

The common features of pensions and annuities, as used in this statute, is the deferment of compensation to a later date when it is to be paid in periodic installments as a wage substitute. *See Rousey*, 544 U.S.

at 331, 125 S. Ct. at 1569 ("The common feature of all of these plans is that they provide income that substitutes for wages earned as salary or hourly compensation."); *In re Foellmi*, 473 B.R. 905, 909 (B.A.P. 8th Cir. 2012) ("[T]o qualify as a 'similar plan,' a plan must provide income that substitutes for wages . . . ."); *In re Vickers*, 408 B.R. 131, 139 (Bankr. E.D. Tenn. 2009) (stating "[t]he common feature of all of these plans is that they provide income that substitutes for wages earned as salary or hourly compensation" (alteration in original) (quoting *Rousey*, 544 U.S. at 331, 125 S. Ct. at 1569)); *Eilbert v. Pelican*, 212 B.R. at 958 ("Iowa Code § 627.6(8)(*e*) is primarily designed to protect those payments which serve as wage substitutes . . . ."); *Pettit*, 55 B.R. at 397–98 (noting that both pensions and annuities "are created to fill or supplement a wage or salary void" and a similar plan or contract would create benefits "akin to future earnings").

In reaching that conclusion, we take guidance from the Supreme Court's decision in *Rousey v. Jacoway*. In that case, the Supreme Court interpreted the parallel provision of the Bankruptcy Code found at 11 U.S.C. § 522(d)(10)(E). *See Rousey*, 544 U.S. at 322, 125 S. Ct. at 1564; *see also In re Eilbert*, 162 F.3d at 526 (noting Iowa Code section 627.6(8)(*e*) was modeled after the federal provision). In *Rousey*, the Supreme Court held that an individual retirement account (IRA) was exempt under 11 U.S.C. § 522(d)(10)(E). 544 U.S. at 334, 125 S. Ct. at 1571. The Court explained what makes pensions and annuities unique is the aspect of "deferred payment." *Id.* at 331, 125 S. Ct. at 1569. The Court reasoned the common feature of the plans identified in the statute was they were "substitutes for wages earned as salary or hourly compensation." *Id.* The Court reasoned that IRAs fell within the statutory exemption because the

age at which the accountholder would normally withdraw funds was retirement age. *Id.*

We also take guidance from other courts that have also concluded that deferred compensation plan payments are "similar" to payments made under a pension or annuity. For example, in *In re Shields*, the bankruptcy court concluded a deferred compensation plan was an exempt substitute for wages:

> Generally, a plan is a similar plan or contract if the plan's payments function as a substitute for wages. Other courts have interpreted this requirement broadly and commented that non-qualified deferred compensation plans are exempt. *See, e.g., In re Threewitt*, 24 B.R. 927, 930 (D. Kan. 1982) (addressing § 522(d)(10)(E) and stating that it "exempts the right to receive payments necessary for support from a wide range of sources, tax-qualified or not, including, for example, Christmas stock bonuses paid upon 25 years of service, or profit-sharing plans restricted to senior employees, or an annuity purchased to provide income to a worker disabled in an industrial accident."). The SERP [supplemental executive retirement plan] payments to Wallace represent compensation that Wallace deferred into retirement and clearly function as a substitute for wages during Wallace's retirement years. The court, therefore, concludes that the SERP is a deferred compensation plan similar to the plans and contracts enumerated in (10)(e).

586 B.R. 315, 321 (Bankr. W.D. Mo. 2018) (emphasis omitted) (citation omitted); *see also In re Lawless*, 591 F. App'x 415, 417 (6th Cir. 2014) ("As Newton now correctly concedes, Lawless's deferred-compensation plan fits the statute's general language. It is a 'pension, profitsharing, annuity, or similar plan or contract' payable 'on account of death, age or length of service.'" (quoting Tenn. Code Ann. § 26–2–111(1)(D))); *In re Maurer*, 268 B.R. 339, 340–41 (Bankr. W.D.N.Y. 2001) (holding deferred compensation plan was exempt even though board had discretion to make distributions before beneficiary acquired specific age), *aff'd*, 2002 WL 1012985 (W.D.N.Y. 2002); *In re Lightbody*, 240 B.R. 545, 548

(Bankr. E.D. Mich. 1999) (holding deferred compensation plan was exempt).

We find the reasoning in *Rousey* and these cases persuasive. Payments under a plan or contract are similar to payments under a pension or annuity when the payments are periodic and deferred to such time when the payments serve as wage substitutes because the recipient is likely to have reduced wage income. *See id.* at 331, 125 S. Ct. at 1569 (holding the IRA income substitutes for wages because withdrawal begins "when [debtors] are likely to be retired and lack wage income"); *see also Pettit,* 55 B.R. at 398 ("[B]enefits under an exempt pension plan are generally not available until a time when the beneficiary's earning capacity is limited."); John Hennigan, Rousey *and the New Retirement Funds Exemption*, 13 Am. Bankr. Inst. L. Rev. 777, 791 (2005) [hereinafter Hennigan].

The payments from McGowen's deferred compensation plan are similar to payments made under a pension or annuity because the payments are deferred payments intended to serve as wage substitutes at a time when it is expected the recipient would have decreased wage income. The deferred compensation payments in this case are paid regularly and periodically. *See Rousey*, 544 U.S. at 330, 125 S. Ct. at 1569 (noting an annuity is payable at regular, periodic intervals). The payments here also serve as a wage substitute deferred until such time it was expected McGowen would have reduced income. Here, the deferred compensation payments are triggered by multiple events, including the plan participant reaching age sixty-seven, disability, death, sale of the company, and separation from employment. All of these triggering events commence payment at a time when the recipient is likely, although not necessarily, to have decreased wage income. It is of no moment that

McGowen is not actually retired. The relevant inquiry for determining whether a payment is similar to an annuity or pension payment is the nature of the payment and not the particular circumstances of the individual. *See id.* at 331, 125 S. Ct. 1569 (noting that the relevant inquiry is whether the payments "provide income that substitutes for wages" and not whether they payments are retirement specific); *see also Foellmi*, 473 B.R. at 909 ("[A] plan must provide income that substitutes for wages, and *not necessarily as retirement or disability income*.").

2.

We next consider whether McGowen's deferred compensation plan payments are "on account of illness, disability, death, age, or length of service" as required by Iowa Code section 627.6(8)(*e*). In a similar provision in the federal bankruptcy code, "on account of" is interpreted to mean "because of." *See Rousey*, 544 U.S. at 326, 125 S. Ct. at 1566 ("This meaning comports with the common understanding of 'on account of.' "). "Thus, 'on account of' . . . requires that the right to receive payment be 'because of' illness, disability, death, age, or length of service." *Id.* at 326–27, 125 S. Ct. at 1566; *see also Pettit*, 55 B.R. at 398 (holding that "[t]he distribution events are related to age, disability, death or length of service").

We conclude McGowen's deferred compensation plan payments were on account of illness, disability, death, age, or length of service within the meaning of the statute. According to the plan documents, the right to receive payments was triggered by one of five events: separation from the company, sale of substantially all the company's assets, death, disability, or attainment of age sixty-seven. Three of the five payment-triggering events—disability, death, and attaining the age of sixty-seven—are

explicitly covered by the statute. Generally speaking, the deferred compensation payments were "on account" of qualifying triggering events.

The fact that the plan contains additional triggering events not explicitly set forth in the statute does not change our conclusion that the payments here are exempt. *See Lightbody*, 240 B.R. at 548 (holding payment under deferred compensation plan exempt and stating "the fact that payments can be obtained for reasons other than those specifically listed, does not affect the exemptibility of the plan"). Sale of the company or the company's assets is a singular event largely outside McGowen's unilateral control. *See Eilbert v. Pelican*, 212 B.R. at 958 (holding "on account of" to be "a factual inquiry into the amount of control the debtor exercised over the . . . timing of the payments"). And separation of employment is an unlikely option due to the significant penalty upon those separating from employment. Specifically, the plan document provides participants forfeit the right to deferred compensation upon working as an accountant elsewhere. It is unlikely a participant would separate from employment merely to obtain access to deferred compensation benefits because to do so would require a significant loss of wage income due to the noncompetition provision. *See, e.g., In re Eilbert*, 162 F.3d at 528 (focusing the inquiry on whether the debtor had "unfettered discretion" on the timing of payments); *In re Hutton*, 893 F.2d 1010, 1011–12 (8th Cir. 1990) (holding a plan was exempt even though debtor could request early withdrawal upon showing a financial hardship); *In re Lilienthal*, 72 B.R. 277, 279 (S.D. Iowa 1987) (holding withdrawal penalty of up to seven percent is not insubstantial and, therefore, annuity qualifies for exemption).

More important, we need not speculate on whether the deferred compensation payments here are on account of age. This case is not a

case, as in *Rousey,* in which the creditor is trying to levy on the corpus of an asset and we must determine whether the debtor might hypothetically have access to plan assets or payments. Here, the payments are already being made. McGowen began receiving Type 1 and Type 2A deferred compensation payments when he reached age sixty-seven. The payments at issue here are thus paid "because of" McGowen's age as required by Iowa Code section 627.6(8)(*e*). It is not of consequence that the payments could have been triggered for other reasons, such as sale of the company, because in this case the payments actually were triggered by age. *See* Hennigan, 13 Am. Bankr. Inst. L. Rev. at 792 ("Trigger events are designated to preserve retirement savings for 'future' use by discouraging un-triggered withdrawals, not necessarily eliminating them completely.").

### III.

Given the liberal construction afforded exemption statutes, we hold McGowen's deferred compensation plan benefits paid upon him attaining age sixty-seven are exempt under Iowa Code section 627.6(8)(*e*). The deferred compensation payments paid under the plan are a substitute for wages and similar to payments made under a pension or annuity.

**REVERSED AND REMANDED.**

All justices concur except Appel, J., who takes no part.